HUDSON VALLEY FUEL CORPORATION
v. BOWLES, Price Administrator.

No. 191.

United States Emergency Court of Appeals.

Heard at Philadelphia, March 20, 1945.

Decided June 28, 1945.

Lauman Martin, of New York City, for complainant.

---

8 Wilson v. Brown, Em.App., 1943, 137 F.2d 348.

Jacob D. Hyman, Chief, Court Review Price Branch, of Washington, D. C., with whom Richard H. Field, General Counsel, Nathaniel L. Nathanson, Associate General Counsel, and Carl H. Fulda, Attorney, all of the Office of Price Administration, all of Washington, D. C., were on the brief, for respondent.

Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.

McALLISTER, Judge.

The Hudson Valley Fuel Corporation, of Troy, N. Y., is engaged in the manufacture of gas, of which coke is a by-product. A part of such coke was marketed in 1941 in New York City by the Maust Coal and Coke Corporation. As a result of certain proceedings not necessary to mention here, the Administrator fixed ceiling prices for the Hudson coke sold in New York City, in accordance with his understanding of the proper application of Maximum Price Regulation 29, By-Product and Retort Gas Coke. Hudson and Maust filed a joint protest directed against the establishment of these maximum prices, basing their protest on the invalidity of the Regulation as applied to their sales. The Administrator denied the joint protest and Hudson, alone, filed a complaint against his action.

Section 9(a) of the above mentioned Regulation applies to sales of coke by producers or distributors and adopts four alternative pricing methods under the following subsections: (1) If a price list was in effect during the period December 15-31, inclusive, 1941, the maximum price is the price specified in such price list, for coke of the same kind, size, and quality, to purchasers of the same general class, and sold by the same method and terms of delivery; (2) If no such price list was issued, then the maximum price is the "average weighted price" charged by the seller for deliveries during the period December 15-31, inclusive, 1941; (3) If neither (1) nor (2), as above outlined, can be applied, the maximum price is the maximum price of the seller's most closely competitive producer or distributor in the same locality for the sale of the same size, kind, and quality of coke; and by the same method and under the same terms of delivery; (4) If none of the three foregoing methods can be used, the maximum price is the price established by the Office of Price Administration on a specified showing, and upon individual application by the producer or distributor, in line with the level of maximum prices established by the Regulation.

Hudson had no price list in effect for the base period, so the method provided by Section 9(a) (1) of the Regulation was not applicable. However, Hudson did make deliveries of coke for industrial use during the base period; and the Administrator, therefore, fixed the maximum price for such coke in accordance with the "weighted average price" provisions for such deliveries, under 9(a) (2).

In addition to the deliveries of coke made by Hudson to Maust for industrial use, Hudson also made a sale of coke to Maust during the base period for domestic use (called the Leach sale); and counsel for the Administrator contends that Hudson's maximum price for coke sold for domestic use was, therefore, fixed by this so-called Leach transaction, under Section 9(a) (2) of Maximum Price Regulation 29.

With regard to Hudson's deliveries of coke for industrial use during the base period, it appears that such deliveries were made pursuant to several contracts embracing yearly requirements of the purchasers, and which contracts had been variously entered into during December, 1940, March, 1941, April 1941,—with one contract entered into in October, 1941, for a three months' supply of coke for the months of October, November, and December, 1941. Most of these contracts were executed a considerable time before the enactment of the Emergency Price Control Act, 50 U.S. C.A.Appendix, § 901 et seq., and, therefore, prior to the time selected in the Regulations for the base period.

Before proceeding further with the discussion, it should be remarked that by-product coke is sold for a multitude of uses,—for blast furnaces, for the manufacture of water gas, and in competition, as fuel, with natural and artificial gas, fuel oil, bituminous coal, and anthracite coal, to mention only a few of such uses. Because of the commodities with which it comes into competition, there had developed before the enactment of the Statute providing for price control, a system of pricing, as a result of which the same coke would sell at different prices depending on the use to which it was put; and the Administrator's statement of considera-

tions which accompanied Maximum Price Regulation 29 gave consideration to this pricing pattern, in which the same commodity commanded different prices for different uses. With this background, we come to the discussion of the validity of the Regulation as applied to Hudson's sales of coke for industrial use.

It is first contended by Hudson that the interpretation and application by the Administrator of Section 9(a) (2) of Maximum Price Regulation 29, as respects its prices for coke sold for industrial purposes, rendered the Regulation invalid as thus applied. This claim is based on the ground that the use of the weighted average price, charged by Hudson for *deliveries* of coke in the base period, does not reflect the prevailing prices at the time of such deliveries, *where such deliveries were made pursuant to contracts and commitments, entered into long before the time* selected for use as the base period.

Section 2(a) of the Emergency Price Control Act provides that "so far as practicable, in establishing any maximum price, the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941 (or if, in the case of any commodity, there are no prevailing prices between such dates, or the prevailing prices between such dates are not generally representative because of abnormal or seasonal market conditions or other cause, then to the prices prevailing during the nearest two-week period in which, in the judgment of the Administrator, the prices for such commodity are generally representative), for the commodity or commodities included under such regulation or order * * *. Every regulation or order issued under the foregoing provisions of this subsection shall be accompanied by a statement of the considerations involved in the issuance of such regulation or order."

It appears that Maximum Price Regulation No. 121 was the initial Regulation pursuant to which Hudson's prices were fixed, but under a combination of this Regulation and a Revised Price Schedule, there was eventually substituted for Maximum Price Regulation No. 121 a new Maximum Price Regulation 29—By-Products and Retort Gas, Coke, which we are here considering. However, for the new Regulation, there was no extensive statement of considerations as concerned the con-

tinued use of the December 15-31, 1941, base period, and accordingly, we can, with propriety, refer to the prior statement of the considerations for Maximum Price Regulation No. 121, in so far as here pertinent, as among the considerations involved in the issuance of Maximum Price Regulation 29.

In the statement of considerations to Maximum Price Regulation 29, the Administrator sets forth that Section 9 thereof states the rules by which a producer or distributor who sells at, or for delivery from an oven plant, may determine his maximum prices and that basically these rules are the same as those previously embodied in Maximum Price Regulation No. 121. In the latter Regulation, the Administrator selected December 15-31, 1941, as the base period inasmuch as "The last two weeks in December reflect the height of the burning season and accordingly constitute a favorable base period for the derivation of maximum prices for solid fuels, particularly solid fuels sold for domestic purposes, as are the bulk of those covered in Maximum Price Regulation No. 121."

The foregoing seems to indicate clearly that the Administrator considered that the prices prevailing in the last two weeks of December, 1941, were the proper ones to be used as maximum prices for solid fuels —in this case, for by-product coke.

Complainant says that because it had no price list in effect in December, 1941, its maximum prices were based (in accordance with Section 9(a) (2)) on deliveries made in December, 1941—with some in the intervening period—and, therefore, that such maximum prices were based on those prevailing long before the time selected as the base period. This, it argues, is contrary to the clear implication of the statement of consideration above mentioned, and in violation of the injunction of Section 2(a) of the Emergency Price Control Act, providing that in establishing any maximum price, the Administrator "shall ascertain and give due consideration to the prices prevailing"—in this case, during December 15-31, 1941.

Counsel for the Administrator submit that the complainant has not established that the Regulation is not generally fair and equitable, or is not otherwise in accord with the law, and that it, therefore, should be sustained, pursuant to Section 204(b) of the Act.

It is, however, argued by complainant that it is unfair, arbitrary, and discriminatory to permit one group of sellers—who have published price lists in effect during the base period—to sell at the prices at which they offered the coke during that period, while the maximum prices of others who did not have such a list are determined by the price at which they delivered coke during the base period.

In answer to this contention, counsel for the Administrator say that the reason he limits the use of offering prices to those cases in which the sellers have price lists in effect during the base period is that the determination of offering prices would be too indefinite and uncertain in the absence of such lists, to furnish a practical basis for the primary pricing method under a freeze regulation. Furthermore, they rely on the conclusions of the Administrator, as expressed in his opinion denying complainant's protest, stating that there is no discrimination between those sellers that had a price list in effect during the base period, and those who, without having such a list in effect, merely made deliveries during that time pursuant to prior commitments.

The reasons given by the Administrator for the above conclusions are stated as follows: "In so far as Protestants contend that it is arbitrary to include in the calculation of the weighted average price deliveries made in accordance with prior commitments they overlook the fact, officially noticed by the Administrator, that the coke industry generally and customarily sold coke for industrial use either under sliding scale agreements which permitted sellers to continuously adjust contract prices to changes in cost, or on a so-called spot basis. In view of those general practices, the Administrator was justified in adopting the definition of 'weighted average price' set forth above, since deliveries under sliding scale agreements at any given period generally reflected the level of prices prevailing during that period and since with regard to spot sales that level could not be determined in any other manner on account of the customary price variations for such sales. Under these circumstances the weighted average pricing formula is obviously a reasonable and generally fair and equitable method."

The Regulation here under attack by complainant was, therefore, based upon the official notice taken by the Administrator that coke was generally and customarily sold on a so-called spot basis or under sliding scale agreements (which permitted sellers continuously to adjust prices to changes in cost). In accordance with the foregoing, the Administrator held that since deliveries under sliding scale contracts in any given period generally reflected the level of prices prevailing during that period, he was justified in adopting the "weighted average price" provision for deliveries made during that period. He further held that, with regard to spot sales, the level of prices prevailing during any given period could not be determined in any other manner than that above mentioned on account of the cash price variations for such sales. The underlying assumption upon which the Administrator proceeded in issuing the Regulation, was that coke for industrial use was generally sold upon a spot basis or under sliding scale agreements.

But Hudson did not sell its coke upon a spot basis or under sliding scale agreements. Its contracts were old contracts. As far as Hudson was concerned, the underlying assumption upon which the Administrator proceeded in issuing the Regulation did not exist; and, as a result, it turns out that the Administrator had included dealers, selling under old contracts with binding commitments long before the base period, in regulations envisaging only dealers selling on a spot basis or with sliding scale agreements.

The fundamental basis of the Regulation is that the asking price of dealers during the base period is adopted as the maximum price. This appears from the fact that, according to the Regulation, if the dealer had a price list in effect during the base period, the prices therein set forth are accepted as the maximum prices. For those dealers who did not have a price list (asking price) in effect during the base period, the maximum price is the average weighted price charged for *deliveries* of coke during the base period. But this latter provision is predicated upon the assumption that, if the deliveries were made during the base period, pursuant to an old contract, there were provisions embodied therein, permitting adjustment of the contract prices—so that, in effect, the maximum price of the dealers under such old contracts with sliding scale provisions, would be the equiva-

lent of an asking price during the base period. The Regulation, therefore, was constructed on the theory that dealers were receiving their asking prices during the base period.

But, here, a dealer, because of its commitments under old contracts without a sliding scale, did not receive its asking price during the base period.

Instead of having its maximum price based upon prices asked during the base period—as would dealers who had sliding scale contracts or price lists in effect during that time—Hudson was limited in its maximum price to the price it had received for deliveries which were made during the base period pursuant to contracts entered into long before that time.

We are of the opinion that there is no justification for treating a dealer who happens to have current price lists, upon the basis of prices asked—and a dealer, who fortuitously lacks these, upon the basis of prices received, for deliveries which were made under unadjustable contracts entered into before the promulgation of the price regulations. And the establishing, on such a theory, of maximum prices for the former class of dealers on a level substantially higher than for the latter, results in discrimination against the latter class of dealers and, therefore, contravenes the statute. It follows that Section 9(a) (2) of Maximum Price Regulation 29 is invalid in so far as it requires, in determining the "average weighted price", the taking into account of deliveries made by the seller under unadjustable contracts of such long standing as not to reflect price levels existing at the price freezing date.

We come, then, to the question of the validity of the Regulation as applied to the coke sold by Hudson for domestic consumption. Hudson asserts that Maust acted as its agent because it was agreed that Maust should receive a certain return on the coke sold by it to its customers. However, the coke was sold by Hudson to Maust f. o. b. ovens, Troy, N. Y. Maust was billed by Hudson and the coke was resold by Maust to its customers. Maust's prices to its customers were higher than Hudson's prices to Maust. Hudson and Maust must establish their prices separately inasmuch as they are separate sellers under Section 10 of the Regulation, which provides:

"(4) 'Producer' means any person engaged in the business of manufacturing byproduct or retort gas coke, and any person acting as the agent of such producer in the sale of such coke.

"(5) 'Distributor' means any person who purchases for resale byproduct or retort gas coke at or for delivery from the producing facility and resells the same in not less than cargo or railroad carload lots without physically handling such coke; it includes any person acting as the agent of such a distributor in the sale of such coke."

Maust was not the agent of Hudson under the intendment of the Regulation.

During the base period, a sale of coke for domestic consumption was made by Hudson to Maust. Under Section 9(a) (2), the price at which such coke was sold must be taken as the maximum price for all sales to Maust of the same kind of coke by the same method and under the same terms of delivery, for the same general use—that is, for domestic consumption.

The Administrator, however, did not establish complainant's maximum prices for sales of coke for domestic consumption in accordance with Section 9(a) (2) of the Regulation. He had before him for consideration the joint protest of Hudson and Maust. In fixing the maximum prices, the Administrator was concerned with the resale of the coke by Maust, and apparently concluded that because such resale during the base period was to a wholesale distributor instead of to a retail dealer, the joint protestants had made no sales to domestic fuel dealers during the base period and that maximum prices for coke sold to such dealers could not, therefore, be established under Section 9(a) (1) or 9(a) (2). He further held that the evidence submitted to show the prices of the most closely competitive producer in the same locality, in accordance with Section 9(a) (3), was of no effect inasmuch as the producer relied upon by the protestants to show maximum prices, was not "the most closely competitive producer in the same locality." The Administrator, therefore, established the maximum price of the coke sold for domestic consumptive, allegedly, under Section 9(a) (4) by using a formula in which he took Maust's sale to the wholesale distributor as a sale comparable to those for which a maximum price was being established. The propriety of the use of such a method in establishing maximum

420

prices to be charged by Maust depends upon whether Maust's sale during the base period was "by the same method and by the same terms of delivery" (Section 9(a) (2), as the sales to be made to retail dealers for which it sought maximum prices. Maust's base period sale was to a wholesale distributor, delivered by barge, New York Harbor. On sales to retail dealers, it proposed to price f. o. b. Troy.

The problem suggested raises interesting questions upon which to speculate. But it relates to maximum prices for Maust, and Maust, not having filed a complaint against the denial of the joint protest, is not before us. We are here concerned only with the determination of the question whether Hudson has established that the Regulation is invalid as applied to its sales of coke for domestic consumption.

Although the maximum price so fixed by the Administrator for Hudson's sale of coke for domestic consumption purported to be established in accordance with Section 9(a) (4) rather than with 9(a) (2) —under which, as we have heretofore observed, the Administrator should properly have proceeded—it devolves that under the method adopted by the Administrator, the price at which Maust sold to Leach, was, on the theory of "a comparable sale," selected as the price "in line with the level of the maximum prices established by the Regulation." (Section 9(a) (4). The use of the price of this sale by Maust to Leach, as a price "in line", resulted, as far as Hudson was concerned, in its maximum price being predicated upon its sale to Maust. For all practical purposes, this appears to have amounted to the same thing as establishing Hudson's maximum price as the price of its sale to Maust, in accordance with Section 9(a) (2). Complainant has not established that the Regulation is invalid as applied to its sales of coke for domestic consumption.

We have considered the other contentions of the parties and find discussion of them unnecessary to our determination.

A judgment will be entered setting aside Section 9(a) (2) of Maximum Price Regulation 29 in so far as it requires the taking into account, in determining the "average weighted price", of deliveries made by the seller under contracts having no provisions for sliding scale adjustments of prices, which were entered into before the Price Regulation was promulgated.